UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

GENTL BONDS,         :
        :
        *Petitioner*,      :
        :
     – against –         :
        :
        :
**WARDEN WILLIAM KEYSER**,      :
        :
        *Respondent*.     :
        :
------------------------------------------------------------- X

**MEMORANDUM
DECISION & ORDER**

16-CV-05908 (AMD)

18-CV-02794 (AMD)

**ANN M. DONNELLY**, United States District Judge:

       The *pro se* petitioner, currently incarcerated at Auburn Correctional Facility, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner was charged with Predatory Sexual Assault, Rape in the First Degree and two counts of Robbery in the First Degree for two attacks in August of 2008. In December of 2010, a jury convicted him of two counts of Robbery in the First Degree, but could not reach a unanimous verdict on the predatory sexual assault and rape charges. The petitioner was retried in October of 2011, and convicted of both counts. He was sentenced to concurrent determinate prison terms of twenty-three years on the robbery counts, and an indeterminate term of twenty-three years to life on the predatory sexual assault and rape charges.

       In separate petitions, the petitioner challenges both convictions.[1] I consolidate the actions because the petitions rely on similar factual and legal arguments. For the reasons that follow, the petitions are denied.[2]

---

[1] Citations to the Court's ECF docket from the petitioner's first habeas petition are identified as "Bonds I," and the second habeas petition and docket as "Bonds II."

[2] Federal courts deciding habeas petitions do not re-examine determinations of state courts on state law issues raised in a habeas petition, only federal constitutional or statutory claims. *See Guerrero v. LaManna*, 325 F. Supp. 3d 476, 483 (S.D.N.Y. 2018) (citing 28 U.S.C. § 2254(a)). Accordingly, I do not reach the merits of the petitioner's state law claims. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

# FACTUAL BACKGROUND[3]

## I.    Overview

In August of 2008, the petitioner attacked and robbed two women at gunpoint in the Richmond Hill neighborhood of Queens.  On August 14, 2008, he robbed Alisha Wilks[4] at gunpoint; he forced her to pull down her pants and underwear, pointed a gun at her vagina and took her wallet and phone.  Two weeks later, the petitioner attacked Shivonne Serraty; he held a gun to her head, raped her and robbed her of her debit card and wallet.  Police arrested him on August 29, 2008.

In written and oral statements, the petitioner admitted that he used a fake gun to attack and rob multiple victims, including several women.  The petitioner admitted that he made Ms. Wilks pull down her pants and robbed her at gunpoint.  He also admitted that he pointed a gun at Ms. Serraty but claimed that Ms. Serraty then willingly had sex with him and gave him her debit card.

In line-ups conducted on the day of the arrest, Ms. Serraty identified the petitioner, but Ms. Wilks did not make an identification and refused to cooperate further.[5]  After the line-up, the petitioner identified Ms. Wilks from a photograph as one of the women he attacked and robbed in August of 2008.

The petitioner was charged with Predatory Sexual Assault (N.Y. Penal Law § 130.95(1)(b)), Rape in the First Degree (N.Y. Penal Law § 130.35(1)), two counts of Robbery in the First Degree (Penal Law § 160.15(4)) and Unlawful Sale or Possession of an Imitation Pistol

---

[3] Because the petitioner was convicted, the facts are summarized in the light most favorable to the verdict.  *See Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).  The facts are drawn from the full record of both state court proceedings.

[4] At various points throughout the record, Ms. Wilks' name is spelled "Elisha" or "Alicia" Wilks.  She did not testify at either trial.

[5] Ms. Wilks was visiting New York from England.

(New York City Administrative Code § 10-131(g)). He went to trial before the Honorable Gregory L. Lasak. As noted above, the jury convicted him of robbery but could not reach a verdict on the rape and predatory sexual assault counts. After that trial, Judge Lasak sentenced the petitioner to concurrent, determinate prison terms of twenty-three years on the robbery counts. In October of 2011, following the convictions on the remaining counts, Judge Lasak sentenced the petitioner to a total of twenty-three years to life for the remaining counts, to run concurrent to his sentence on the robberies.

The Appellate Division, Second Department affirmed both convictions, and the Court of Appeals denied leave to appeal. The petitioner filed petitions for writs of error *coram nobis*, which were also denied.

## II. Pre-Trial Suppression Hearing

Before the first trial, the petitioner moved to suppress his post-arrest statements to police and prosecutors. On February 23, 2010, Judicial Hearing Officer Arthur S. Cooperman held a hearing on the motion. (Bonds I: ECF No. 8 at 553-609.)

Detective Richard Santangelo testified that he arrested the petitioner on August 28, 2008 at his parents' home in Queens after one of the victims identified the petitioner from a photograph. (*Id.* at 556:8-13, 564:9-566:25.) Detective Santangelo took the petitioner to the Special Victims Squad at around 1:15 in the morning. (*Id.* at 567:23-568:2.) He advised the petitioner of his constitutional rights from a pre-printed form; the petitioner waived his rights and signed the form. (*Id.* at 568:3-570:16.)

The petitioner admitted that he committed multiple robberies, and specifically confessed to attacks on Ms. Wilks and Ms. Serraty; he claimed, however, that Ms. Serraty had sex with him voluntarily, and willingly gave him her debit card. (*Id.* at 570:21-571:12.) At Detective

3

Santangelo's request, the petitioner wrote out five statements between 1:15 a.m. and 3:30 a.m., as follows:

- "I robbed a person near 118th Street and 133rd Avenue. The victim was a male. I robbed a female somewhere near Queens Boulevard. The victim was a female. I used a fake black gun to rob these people. I disposed of the gun. I apologize for my actions and the people I have hurt." (*Id.* at 721:13-17.)

- "I was told I robbed a female on Sunday. I do not recall this because I was intoxicated. There has been plenty of nights I was intoxicated and don't remember my actions." (*Id.* at 722:6-8.)

- "I'm referred to as General. I've been called that since junior high. My phone is under my cousin's name." (*Id.* at 723:17-22.)

- "I approached a girl with a fake gun, planning to rob her. When I approached her, I pulled her to the side. She started talking to me, telling me how she was having a really horrible day. I said really? What happened? She had told me that she just caught her boyfriend cheating on her. We were kneeled down to prevent cars from seeing us. She stood up, pulled her pants down and said go ahead, do it. Afterwards she gave me her credit card. Note that she did have conversation with me. She told me she lived just up the block and how her credit card was in her sister's name. She then gave me the pin and told me there was 800 in savings in 200 in checking. I did not ask for the credit card. She offered. We had sex in a position where I was behind her. Afterwards I ran off and turned up a block. No, there was no one chasing me." (*Id.* at 724:17-725:10.)

- "I approached a girl planning to rob her like the other incident. I was intoxicated. I seen her, pulled her into a driveway and told her to put her bag down. I then told her to pull her pants down. She unbuckled it and began to pull it down. As soon as she unbuckled her pants and pulled it down just a little, I told her to stop. I told her to buckle back up and run down the block. I told her I wasn't going to rape her, kill her or hurt her. I took her bag." (*Id.* at 724:22-726:9.)

The petitioner signed and dated each statement.

At around eleven-thirty in the morning, the petitioner made a videotaped statement to an assistant district attorney, in which he admitted to robbing Ms. Wilks; he also admitted to pointing a gun at Ms. Serraty, but again claimed that the sex was consensual and that she

volunteered her debit card.  (*Id.* at 577:1-24.)[6]  Later that day, Detective Santangelo put the

petitioner in a line-up, which Ms. Wilks, Ms. Serraty and her boyfriend Johnell Adams viewed

separately.  (*Id.* at 579:1-581:3.)  Ms. Serraty identified the petitioner.  (*Id.* at 581:2-12.)  Mr.

Adams did not identify anyone.  (*Id.* at 597:1-3.)  Ms. Wilks said she did not recognize anyone in

the line-up and was "uncooperative as far as continuing."  (*Id.* at 734:12-15, 581:16-22.)  She

agreed to let Detective Santangelo take her photograph, which he then showed to the petitioner.

(*Id.* at 582:4-11.)  The petitioner recognized Ms. Wilks as the woman he robbed after forcing her

to pull down her pants.  (*Id.* at 582:11-13.)  He signed the back of the photograph and wrote,

"This is the girl from the robbery incident."  (*Id.* at 583:16-18.)

The petitioner did not call any witnesses.  The judicial hearing officer recommended that

the petitioner's motion to suppress be denied, a recommendation that Judge Richard Buchter

adopted.

## III.    The Petitioner's First Trial

a.    <u>The Prosecution's Case</u>

The petitioner went to trial before Judge Lasak and a jury on December 1, 2010.  The

prosecution called ten witnesses: Officer John Sforza, Detective Richard Santangelo, Desiree

Rahman, Shivonne Serraty, Sergeant Elena Fezza, Detective Samuel Gilford, Detective Caryn

Eldridge, Officer Demetrius Starling, Alan Pollack and Kareem Belt.  The prosecution

established the following facts.

On the evening of August 12, 2008, Alisha Wilks was walking down 131st Street in the

Richmond Hill neighborhood of Queens.[7]  The petitioner came up behind her, put a gun to her

---

[6] Before the interview started, the prosecutor advised the petitioner of his constitutional rights, which he waived.

[7] Ms. Wilks did not testify at trial.  Her statements to Desiree Rahman, who helped her after the robbery, were admitted as excited utterances.  The jury also heard recordings of Ms. Rahman's call to 911, in

side and ordered her to walk up a driveway at 105-54 131st Street.  He told her to pull down her pants and underwear, which she did.  He took her wallet, cell phone, keys and money, and then looked closely at her body, pointing a gun at her vagina.  He told her to pull up her pants and run, which she did.  (*Id.* at 724:22-726:9, 893:3-8.)

That same evening, Desiree Rahman was at her home on 135th Street in Richmond Hill. As she was standing at her door saying goodbye to her cousin, Ms. Wilks, "crying in distress" and "scared," ran to Ms. Rahman while "looking over her shoulder."  (Bonds I: ECF No. 8-2 at 880:13-25, 881:9.)  Her belt and pants were unbuckled, and she was missing an earring.  (*Id.* at 881:6-7.)  When Ms. Rahman asked her if she was lost, Ms. Wilks responded, "He has a gun." (*Id.* at 881:15-23.)  At that point, Ms. Rahman brought her inside; Ms. Wilks said she had been robbed and that a man had taken her things and "made her pull her pants down."  (*Id.* at 882:17-21.)  Ms. Rahman called the police and told them what the victim had told her about the attack. On the 911 call, which was played at trial, Ms. Wilks can be heard describing her attacker as "a black male with braids and a bandana or something on the face."  (*Id.* at 883:14-24.)  Ms. Rahman told the police that Ms. Wilks said she had been attacked in a driveway "down the block" from Ms. Rahman's house.  (*Id.* at 891:3-13.)[8]

Officer Demetrius Starling received a radio call reporting the robbery and arrived at Ms. Rahman's house shortly before midnight.  (Bonds I: ECF No. 8-3 at 995:11-19.)  Ms. Wilks was in tears, sitting on a bed in the back of the house with her pants undone.  (*Id.* at 996:1-9.)  She told Officer Starling that someone had pointed a gun at her and taken her purse, and that she had almost been raped.  (*Id.* at 996:9-997:17.)  Ms. Wilks showed the officers where the attack had

---

which Ms. Wilks could also be heard.  Defense counsel did not object to the 911 recording.  (Bonds I: ECF No. 8-2 at 884:17-25.)
[8] Before Ms. Rahman testified, the prosecutor disclosed that he agreed to be a reference for her because she had acted as a "Good Samaritan."  (Bonds I: ECF No. 8-2 at 878:3-10.)

taken place.  (*Id.* at 997:18-998:24.)  Officer Starling brought Ms. Wilks back to the 106th

Precinct, where she was interviewed by detectives, and then drove her to a friend's apartment in

Queens.  (*Id*. at 999:17-1000:6.)

Two weeks later, on August 24, 2008, Shivonne Serraty, a nineteen-year-old preschool

teacher, was at a movie theater with her then-boyfriend, Johnell Adams.  They argued about a

call Adams received from his ex-girlfriend, and then went to his Richmond Hill apartment,

where they fell asleep.  (Bonds I: ECF No. 8-2 at 897:1-10.)  Ms. Serraty's mother called her and

told her to come home, and Ms. Serraty left the apartment at around 1:15 A.M to get cash from

the ATM at a nearby deli.  (*Id*. at 898:3-14, 899:2-11.)

As she walked back towards Adams' house to wait for a cab, the petitioner approached

her from behind and told her, "Do not look at me.  Do not look back.  Just do whatever I say."

(*Id.* at 901:10-11.)  He pushed a gun into her back, forced her into a backyard behind a parked

car and told her to "get on [her] knees" and open her bag.  (*Id.* at 902:16-903:21.)  Ms. Serraty

was shaking and begged him, "Please don't kill me.  Please don't hurt me,"  (*id.* at 903:22-25)

and offered him "everything in [her] bag."  (*Id.*)  When she turned around the petitioner was

standing over her, part of his face covered, pointing a gun at her face.  (*Id.* at 904:7-16.)

The petitioner told her to get up and took her further up the driveway to a balcony.  (*Id.* at

905:24-906:2.)  He pressed the gun to her back and ordered her to pull down her pants and

underwear.  (*Id.* at 906:3-10.)  He said, "Do what I say, and I won't hurt you.  I won't kill you."

(*Id.* at 906:20-907:2.)  The petitioner told her that she was "a very pretty girl" and not to tell

anyone or he would "come find [her]."  (*Id.* at 908:1-5.)  He pushed her against the wall, told her

to spread her legs, and put his penis into her vagina, the gun still pressed into her back.  (*Id.* at

909:1-10.)  When he finished, he told her not to look at him and forced her to sit on a nearby

swing.  (*Id.* at 910:1-6.)  She was crying and asked him why he had raped her, telling him that she had already been having a bad day and had fought with her boyfriend.  (*Id.* at 911:1-4.)  He told her to give him all her cash, her debit card and the pin number.  (*Id.* at 911:5-15.)  When she told him the debit card belonged to her mother, he said, "Now I know your mother.  Do not tell anybody because I'll come find you.  I'll come after your family."  (*Id.* at 911:11-15.)

The petitioner told her she could leave.  (*Id.* at 912:6-7.)  Ms. Serraty, realizing that she was close to her boyfriend's house, asked the petitioner if he would walk with her, hoping that her boyfriend would see him.  (*Id.* at 912:1-16.)  As soon as the petitioner crossed the street, Ms. Serraty ran into the house, screaming that she had been raped and that her attacker was outside.  (*Id.*)  Her boyfriend and his roommates ran outside and returned about fifteen minutes later.  (*Id.* at 915:2-10.)  One of the roommates called 911.  (*Id.*)

Officer John Sforza arrived from the local precinct.  (Bonds I: ECF No. 8 at 664:13-16.)  Ms. Serraty told him that she had been attacked and raped.  (*Id.* at 665:1-3.)  While other officers searched for the attacker, an ambulance took Ms. Serraty to a local hospital, where doctors examined her and prepared a rape kit that included vaginal swabs.  (*Id.* at 666:11-668:5.)

In an August 26, 2008 interview with Detective Richard Santangelo, Ms. Serraty described her attacker as a tall black man of average build; "something black" was covering his face and nose, and he had "a silver handgun."  (Bonds I: ECF No. 8-1 at 778:15-16; ECF No. 8 at 559:4-9.)  She looked through photographs, but did not recognize anyone.  (*Id*. at 707:23-708:5.)

After receiving an "investigatory lead," the police focused on the petitioner and learned that his nickname was "General."  (*Id.* at 709:4-25; 804:15-21.)[9]  Detective Santangelo put

---

[9] During the first trial, the attorneys and witnesses described the investigation into the petitioner as prompted by an "investigatory lead."  (Bonds I: ECF No. 8-1 at 709:4-25.)  At a sidebar conference

together a photographic array with the petitioner's photograph and showed the array to Ms. Serraty and her boyfriend separately. Mr. Adams did not recognize anyone in the photo array, but Ms. Serraty identified the petitioner's photograph. (*Id.* at 805:6-807:9.)

Detective Santangelo went to the petitioner's house to arrest him. (*Id.* at 710:4-18.) The petitioner's father, Philip Kinard, told Detective Santangelo that he would have the petitioner call when he came back. (*Id.* at 710:21-711:4.) Detective Santangelo and other members of the Special Victims Squad waited outside, and about two hours later, saw the petitioner walking down the street. (*Id.* at 711:21-712:17.) When Detective Santangelo asked the petitioner if they could talk, the petitioner kept walking and said he wanted to go home first. (*Id.* at 812:3-6.) Detective Santangelo's partner tried to grab the petitioner, and the petitioner ran into his house. (*Id.* at 712:5-12.) At that point, the petitioner's father told the detectives to come inside, and instructed the petitioner to put his hands behind his back. (*Id.* at 713:3-17.) Detective Santangelo arrested him and brought him to the Special Victims Squad. (*Id.* at 713:19-22.)

After waiving his rights, the petitioner made oral and written statements in which he admitted to gunpoint robberies; he described the attacks on Ms. Wilks and Ms. Serraty, although he claimed that Ms. Serraty consented to having sex with him and willingly gave him her debit card. (*Id.* at 721:13-726:9.) The petitioner also made a videotaped confession to an assistant district attorney. (Bonds I: ECF No. 8-1 at 726:18-729:19.)[10]

---

during the second trial, the prosecutor advised the court that a woman told the police that "a male known to her as General . . . stated that he did something bad . . . [h]e had been drinking when he saw a girl walking somewhere in Richmond Hill. He wants her phone and tells her that he's not going to rape her, but the girl pulled down her pants and said just do it." (Bonds I: ECF No. 8-8 at 1699:1-12.) The court precluded any mention of the tip before the jury and instructed the parties to continue describing it as "an investigatory lead." (*Id.* at 1700-1705.)

[10] At the second trial, at defense counsel's request, the prosecutor redacted the videotaped confession to remove references to the Wilks robbery. (Bonds I: ECF No. 8-6 at 1409:15-1410:11.)

Ms. Serraty identified the petitioner in a line-up as the man who raped her. (Bonds I: ECF No. 8 at 581:2-12.) Ms. Wilks did not identify anyone, and did not want to cooperate, although she let Detective Santangelo take her photograph, which he then showed to the petitioner. (*Id.* at 734:12-15.) The petitioner recognized Ms. Wilks as the woman he had robbed and forced to pull down her pants. (*Id.* at 582:4-11.) DNA analysis established that the petitioner's DNA matched semen collected from Ms. Serraty's rape kit.[11] (Bonds I: ECF No. 8-8 at 1644:20-25.)

     b.  <u>The Defense's Case</u>

The petitioner called two witnesses: his father, Philip Kinard, and his friend, Jasmine Smith.

Kinard[12] testified that he and his wife, both corrections officers, owned three guns. (Bonds I: ECF No. 8-3 at 1096:1-1098:14.) They kept two at a shooting range in the Bronx; the third, a .38 caliber, two-inch Lady Smith with a dark blue finish and wooden handle, was in a safe at their home to which only Kinard had access. (*Id.* at 1061:13-1062:1.)

Jasmine Smith testified that she was with the petitioner on August 24, 2008. (Bonds I: ECF No. 8-4 at 1138:16-24.) At around 10:30 p.m., they stopped at a deli on 123rd and Liberty Avenue to get a snack, and a young woman walked up to the petitioner "like she knew him." (*Id.* at 1141:21-1142:22.) After around ten minutes, the petitioner and the woman got in the car. (*Id.* at 1142:24-1143:7.) They got out of the car after about thirty minutes, and the woman asked

---

[11] The petitioner would not provide a DNA sample, but Detective Santangelo preserved the cup from which he drank and submitted it for DNA testing. (Bonds I: ECF No. 8-6 at 1414:1-10.) Prosecutors later got a court order to collect a buccal swab from the petitioner. (*Id.* at 1418:14-25.)

[12] Kinard, the petitioner's biological uncle, adopted the petitioner because his mother was addicted to drugs. (Bonds I: ECF No. 8-3 at 1059:18-19.)

the petitioner to walk her home. (*Id.* at 1144:6-7.) He walked the woman up the block, said goodbye and drove Ms. Smith home. (*Id.* at 1144:11-13.)

The police knocked on the Kinards' door and asked to speak to the petitioner about a "domestic thing about him and his girlfriend." (*Id.* at 1112:1-2.) Mr. Kinard called the petitioner and told him to come home, and detectives returned and arrested him. (*Id.* at 1112:12-1113:25.) During a conversation the next day, Mr. Kinard thanked Detective Santangelo for his professionalism. (*Id.* at 1114:15-18.)

Mr. Kinard learned that Aima Bolton told the police that the petitioner admitted that he had raped and robbed someone, and had robbed other people. (*Id.* at 1100:14-1103:8.) Mr. Kinard called the petitioner at Rikers Island and told him that he knew who had reported him to the police. (*Id.* at 1103:14-1105:3.)[13] The petitioner replied that he "didn't tell anybody" and that "the cops had made up the whole story." (*Id.* at 1105:5-14.) When Mr. Kinard said that Ms. Bolton "used . . . the exact words that were in the police report [Kinard] read," (*id.* at 1106:20-1108:18), the petitioner said, "I know who made the call," and that "he need[ed] to speak to [Kinard] in person" because the call was being recorded. (*Id.* at 1109:8-1110:6.)

c. <u>Jury Deliberations and Partial Verdict</u>

The jurors began deliberations on December 13, 2010. (Bonds I: ECF No. 8-5 at 1265.) The next day, they sent two notes to the court. In the first note, they wrote that they had "currently reached an impasse" because "[j]uror number five insists that on two of the counts she cannot change her stance." (*Id.* at 1303:18-25.) A second note read: "Juror number five would like to speak to the judge privately." (*Id.* at 1304:10-13.) Defense counsel agreed that the court

---

[13] The recording of the call was not played for the jury, but the prosecutor used it to refresh Mr. Kinard's recollection. (Bonds I: ECF No. 8-3 at 1103:7-8.)

should bring the jury out.  (*Id.* at 1304:13-24.)  At that point, Judge Lasak did not speak to juror number five.  (*Id.*)

Judge Lasak asked the jurors to tell him in a note whether they had reached a unanimous verdict on any of the counts.  (*Id.* at 1305:8-1306:6.)  The jury sent a note confirming that they had reached a unanimous verdict on the robbery counts.  (*Id.* at 1306:24-1307:8.)  The court took the verdict, and the jury found the petitioner guilty of both robberies.  (*Id.* at 1308:1-10.)  Judge Lasak polled the jury, and each juror confirmed the verdict.  (*Id.* at 1308:4-1310:1.)  The judge gave the jurors an *Allen* charge, and directed them to continue deliberating on the remaining counts.  (*Id.* at 1310:2-1312:12.)

After another full day of deliberations, defense counsel moved for a mistrial; he was "very concerned that it's been twenty-four hours with this impasse with juror number five," and that "we may be arriving at the point where . . . we get a verdict under pressure as opposed to rational deliberations."  (*Id.* at 1316:23-1317:13.)  The court denied the motion.  (*Id.*)

The next day, juror number five sent out a note that read, "I would like to speak to the judge privately."  (*Id.* at 1318:20-24.)  When the juror was brought into the courtroom, she said that she did not think she could continue to deliberate, and that "one of the jurors threatened . . . to throw [her] out the window yesterday" because she "couldn't agree with the other jurors."  (*Id.* at 1319:11-15.)  Another juror also "made some comments about the defendant, what the defendant would do if I let him go."  (*Id.* at 1320:21-25.)  The judge granted the petitioner's motion for a mistrial on the remaining counts.  (*Id.* at 1320:1-15.)

Counsel then moved for a mistrial on the counts on which the jury had convicted the petitioner, asserting that there was "evidence of juror misconduct and threats that may have tainted juror number five" and her vote to convict the petitioner on the robbery counts.  (*Id.* at

1320:19-1321:16.)  In the alternative, defense counsel asked the court to make a limited inquiry into juror five's verdict.  (*Id*.)  The court polled the jurors a second time; each juror confirmed his or her verdict on the robbery counts.  (*Id*. at 1321:23-1324:24.)  The court denied the motion for a mistrial; "the juror was polled twice as to her verdict," and there was no basis for granting the motion.  (*Id*. at 1325:5-9.)

    d.  <u>Sentencing</u>

On March 30, 2011, Judge Lasak sentenced the petitioner to two concurrent terms of twenty-three years for each robbery.  (*Id*. at 1338:2-14.)

## IV.  **The Petitioner's Second Trial**

    a.  <u>The Prosecution's Case</u>

The petitioner went to trial on the sex crimes on July 25, 2011.  The prosecution established the same facts as the first trial, except that there was no evidence about the robbery of Ms. Wilks.  (*See generally* Bonds II: ECF No. 7.)

    b.  <u>The Petitioner's Case</u>

Mr. Kinard testified as he did at the first trial, except that he described the petitioner's ex-girlfriend as angry and violent, and claimed that she lied to police about the petitioner's admissions to the robberies.  (Bonds I: ECF No. 8-8 at 1680-1700.)[14]

    c.  <u>N.Y. Crim. Proc. Law § 330.30 Motion to Vacate</u>

The petitioner moved to set aside the verdict pursuant to N.Y. Crim. Proc. Law § 330.30 on the ground that the prosecutor did not turn over the 911 recordings in a timely fashion.  The prosecutor responded that he turned over the recordings before the trial—once to the petitioner's first lawyer, and again to trial counsel.  (Bonds I: ECF No. 7 at 60-65.)  The court denied the

---

[14] Jasmine Smith did not testify at the second trial.

motion, citing *People v. Brown*, 67 N.Y.2d 555 (1986), in which the Court of Appeals held that a defendant "cannot claim that he was deprived of due process when he had the opportunity . . . to cross-examine the identifying witness using the allegedly exculpatory evidence." *Id.* at 559; *see also* ECF No. 7 at 67-68.

    d.  <u>N.Y. Crim. Proc. Law § 440.10 Motion to Vacate</u>

The petitioner, represented by counsel, moved pursuant to Section 440.10 of New York's Criminal Procedure Law to vacate the robbery convictions. (Bonds I: ECF No. 7 at 77-98.) The petitioner argued that his conviction should be vacated because of newly-discovered evidence about two potential witnesses—Ms. Serraty's boyfriend and his roommate, who both called 911 and said Ms. Serraty had been attacked by two men who escaped in a green Toyota Camry. The petitioner argued that the prosecutor withheld information about these witnesses and about the 911 calls they made. (*Id.*) The prosecution responded that he turned this information over to the petitioner, and that it was not newly discovered because the petitioner had access to it before the first trial. (*Id.* at 92-98.) On July 19, 2011, Judge Lasak denied the petitioner's motion to vacate. (*Id.* at 140.)

    e.  <u>Verdict and Sentencing</u>

The jury convicted the petitioner of both counts. On October 5, 2011, Judge Lasak sentenced the petitioner to concurrent, indeterminate terms of twenty-three years to life, to run concurrent to the sentence on the robbery counts. (Bonds I: ECF No. 8-9 at 1843-1852.)

**POST-CONVICTION PROCEEDINGS**

**I.  Direct Appeal**

    a.  <u>Bonds I</u>

In May of 2013, the petitioner, represented by counsel, appealed the robbery conviction

to the Appellate Division, Second Department. He argued that the trial court should have granted his motion to suppress his statements, which he maintained were coerced. He challenged the sufficiency of the evidence on the Wilks robbery, claiming that the admission of the 911 call and Ms. Rahman's testimony violated the Confrontation Clause, and there was no corroboration for the confession. He also accused the prosecutor of misconduct in his opening statement, late disclosure of exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and permitting a witness to use him as a job reference. Finally, he argued that his trial attorney was ineffective because he did not move to sever the charges.

The Appellate Division affirmed the petitioner's conviction. *People v. Bonds*, 118 A.D.3d 717, 717-20 (2d Dep't 2014). The court rejected the petitioner's argument that his confessions were coerced, concluding that "the record does not support the conclusion that the police unnecessarily delayed his arraignment for purposes of depriving him of his right to counsel and obtaining an involuntary confession," and that the petitioner "confessed to his involvement in both incidents within three hours of his arrest." *Id.* at 718. Nor did "the evidence presented at trial . . . establish that the defendant's statements were involuntary." *Id.* The Appellate Division also rejected the petitioner's claim that the evidence was insufficient because the conviction was based on Ms. Wilks' out-of-court statements; the court found that the claim was unpreserved because the defense objected only on hearsay grounds, not on Confrontation Clause grounds. *Id.* at 718-19. In any event, the contents of the 911 call and Ms. Rahman's testimony about Ms. Wilks' account of the robbery were "properly admitted under the excited utterance exception of the hearsay rule," and "did not constitute a confrontation clause violation." *Id.* at 719. Accordingly, the evidence was legally sufficient because the petitioner's

confession was "amply corroborated by independent evidence that the subject crime was committed." *Id*.

The court also rejected the petitioner's complaint about the prosecutor's opening statement as "unpreserved for appellate review" and "[i]n any event, . . . without merit," because the prosecutor "adequately described . . . what the People intended to prove, and properly prepared the jury to resolve the factual issues at the trial." *Id*. at 719. The Appellate Division agreed that the prosecutor's agreement to act as a job reference for Ms. Rahman was "improper under the circumstances of the case," but the prosecution disclosed it, and it "did not deprive the defendant of a fair trial." *Id*. at 720. The court also ruled that the trial judge properly denied the petitioner's 330.30 motion because the prosecutor turned over discovery "before opening statements were made and in sufficient time for [counsel] to use it in a meaningful fashion during cross-examination or as evidence during his case." *Id*. Finally, the Appellate Division held that "the remaining contention"—the ineffective assistance of counsel claim—was "without merit." *Id.* The Court of Appeals denied the petitioner's application for leave to appeal on August 29, 2014. *People v. Bonds*, 23 N.Y.3d 1059 (2014).

b. <u>Bonds II</u>

The petitioner, represented by counsel, also appealed the sexual assault and rape convictions, making most of the same arguments he made in the first appeal: that his statements should have been suppressed, that the prosecutor's opening statement violated his right to a fair trial, that his lawyer was ineffective and that the prosecutor committed *Brady* violations. He also claimed that the court's admission of his videotaped statement—redacted to remove references to the Wilks robbery—was error because someone might have tampered with the videotape, and because the trial court did not make "further inquiry as to its creation and content." (Bonds I:

The Appellate Division affirmed this conviction as well, *People v. Bonds*, 128 A.D.3d 1083 (2d Dep't 2015), ruling there was "no basis" to reconsider its prior decision about the suppression of the petitioner's post-arrest statements, and that "absent a showing of manifest error . . . or that exceptional circumstances exist warranting departure from the law of the case doctrine, the defendant is precluded from having this issue reconsidered." *Id.* at 1083. The Appellate Division rejected the petitioner's claim about his videotaped statement as not preserved and otherwise meritless. *Id.* at 1084.

The court found that the prosecutorial misconduct claims were both unpreserved and meritless. Specifically, the court ruled that the prosecutor "adequately described in his opening statement what the People intended to prove, and properly prepared the jury to resolve the factual issues at the trial." *Id.* at 1084. Nor did the petitioner "demonstrate[] that his trial counsel was ineffective under federal or state constitutional standards;" the record demonstrated that "defense counsel provided meaningful representation as a whole." *Id.* at 1084. The court rejected the petitioner's remaining arguments about the alleged *Brady* violations as "without merit." *Id.* The Court of Appeals denied leave to appeal on August 28, 2015. *People v. Bonds*, 26 N.Y.3d 926 (2015).

## II.    Coram Nobis Petitions

The petitioner, represented by a different attorney, moved for a writ of error coram nobis after both appeals, claiming that his appellate lawyer was ineffective for failing to raise purported errors by trial counsel during both trials. The Appellate Division denied both motions, finding that the petitioner "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Bonds*, 140 A.D.3d 897 (2d Dep't 2016) (denying writ of error

coram nobis following first appeal); *People v. Bonds*, 161 A.D.3d 765 (2d Dep't 2018) (denying

writ of error coram nobis following second appeal). The Court of Appeals denied leave to

appeal. *People v. Bonds*, 28 N.Y.3d 1026 (2016); *People v. Bonds*, 31 N.Y.3d 1145 (2018).

## III.    Habeas Petitions

The petitioner filed a *pro se* habeas petition challenging the first conviction on October

24, 2016, and another petition challenging the second conviction on May 10, 2018; the claims in

the petitions overlap. (Bonds I: ECF No. 1; Bonds II: ECF No. 1.) The petitioner argues that

both convictions were unconstitutional because his post-arrest statements should have been

suppressed and because of prosecutorial misconduct. He alleges *Brady* violations and ineffective

assistance of trial and appellate counsel, and claims that the court admitted hearsay statements at

his first trial. For the reasons that follow, both petitions are denied.

## LEGAL STANDARD

A federal court reviewing a habeas petition must not "review a question of federal law

decided by a state court if the decision of that court rests on a state law ground that

is independent of the federal question and adequate to support the judgment." *Coleman v.

Thompson*, 501 U.S. 722, 729 (1991). This doctrine applies to both substantive and procedural

state law grounds. *Id.* at 729-30.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a

federal court reviewing a state prisoner's habeas petition to give deference to a state court's

decision on the merits. 28 U.S.C. § 2254(a). A federal court may not issue a writ of habeas

corpus unless the state court's decision was "contrary to, or involved an unreasonable application

of, clearly established Federal law" or was "based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also*

*Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13. The court reviews the last reasoned state court decision. *Ylst v. Nunnemaker,* 501 U.S. 797, 804 (1991); *Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir. 2000). The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A petitioner can seek federal habeas corpus relief only after he exhausts state court remedies and gives the state courts a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

## DISCUSSION

For the reasons that follow, I reject the petitioner's arguments and deny both petitions in their entirety.

## I.  Suppression of Post-Arrest Statements

The petitioner argues in both petitions that his "false confession" to law enforcement should have been suppressed.  Specifically, he claims that the police and district attorney "coerced an[] inadmissible statement from [him] by holding him in isolation" for eighteen hours, (Bonds I: ECF No. 1 at 9), for the "purposes of ex[tr]acting a coerced confession."  (Bonds II: ECF No. 1 at 8.)

The voluntariness of a petitioner's confession is a question of law which the court reviews *de novo*.  *Miller v. Fenton*, 474 U.S. 104, 112 (1985).  The court considers the totality of the circumstances surrounding the petitioner's statements, including the conditions of the interrogation, the petitioner's personal characteristics and the conduct of law enforcement officials.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).  The court can also consider the "age and intelligence of the defendant, whether the defendant was advised of his constitutional rights, the length of the detention, whether the questioning was prolonged, the conduct of law enforcement officials, and whether there was physical punishment such as the deprivation of food or sleep."  *Ajcúc v. New York*, No. 18-CV-00183, 2019 WL 3409515, at *7 (E.D.N.Y. July 29, 2019) (citations omitted).[15]

---

[15] To the extent the petitioner challenges the admission of these statements on the theory that the police delayed his arraignment in order to obtain an involuntary confession, that claim does not provide any basis for habeas relief.  There is no evidence that police delayed the petitioner's arraignment unreasonably—he was arraigned within eighteen hours of his arrest, well within the twenty-four-hour period required by state law.  N.Y. Crim. Proc. Law § 140.20(1).  The Appellate Division agreed, finding that "the record does not support the conclusion that the police unnecessarily delayed [the petitioner's]

The appellate court found no evidence that detectives or the prosecutor coerced the petitioner into confessing. Although I review *de novo* the question of whether law enforcement coerced the petitioner, the state court's factual findings are "presumed to be correct." 28 U.S.C. § 2254(e)(1); *see also Hoover v. Leonardo*, No. 91-CV-1211, 1996 WL 1088204, at *6 (E.D.N.Y. June 11, 1996). The Appellate Division found that the petitioner "confessed to his involvement in both incidents within three hours of his arrest," was not handcuffed, and was "given food, water, access to a bathroom, and an opportunity to rest in between questioning." *Bonds*, 118 A.D.3d at 717.

I find no basis to disturb the state court's findings. After the detective advised him of his rights, the petitioner told the police not only about the two attacks with which he was charged, but about other robberies. He made written statements and then gave a videotaped statement to an assistant district attorney after being advised of his rights a second time. The petitioner cites the length of the interviews, but the record shows that he spoke to Detective Santangelo for three hours, and after a break of eight hours, made a videotaped statement later that morning to an assistant district attorney. As the Appellate Division found, he was not handcuffed and was given food, water, and bathroom breaks. *Bonds*, 118 A.D.3d at 718.[16] I find no basis to conclude that the appellate court's decision was unreasonable. Therefore, this claim is denied.

## II.     Prosecutorial Misconduct

The petitioner claims that the prosecutor committed misconduct in both trials by making unfair and inflammatory remarks during his opening statements. (Bonds I: ECF No. 1 at 11; Bonds II, ECF No. 1 at 9.)

---

arraignment for purposes of depriving him of his right to counsel and obtaining an involuntary confession." *Bonds*, 118 A.D.3d at 717.

[16] Moreover, his statement about the attack on Ms. Serraty was partially exculpatory.

"[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990); *see also* N.Y. Crim. Proc. Law § 470.05(2). Federal courts do not "review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quotation and citation omitted). New York's contemporaneous objection rule "is a firmly established, independent, and adequate state ground that bars habeas review of the merits of a constitutional claim." *Williams v. Artus*, 691 F. Supp. 2d 515, 524 (S.D.N.Y. 2010).

The Appellate Division rejected the petitioner's complaints about the prosecutor's opening statements as "unpreserved for appellate review, as the defendant failed to object to the prosecutor's allegedly improper remarks or move for a mistrial or seek curative instructions." *Bonds*, 118 A.D.3d at 717; *see also Bonds*, 128 A.D.3d at 1083 (denying claim following second trial). Therefore, the petitioner's claims are procedurally barred. Nor has the petitioner demonstrated any cause for the procedural default or actual prejudice, and there is no evidence that denying his request for relief would result in a fundamental miscarriage of justice, or that the petitioner is actually innocent. *See Harris v. Reed*, 489 U.S. 255, 262 (1989); *Parks v. Sheahan*, 104 F. Supp. 3d 271, 282 (E.D.N.Y. 2015).

Even if these claims were not barred, they cannot succeed on the merits. There was nothing improper about the prosecutor's opening statement at either trial, let alone anything that "so infected the trial with unfairness as to make the resulting conviction a denial of [the petitioner's] due process [rights]." *McCall v. Capra*, 102 F. Supp. 3d 427, 446 (E.D.N.Y. 2015)

(citations omitted); *see also United States v. Faisal*, 282 F. App'x 849, 850-51 (2d Cir. 2008). It is a "rare case" in which even improper comments by a prosecutor during trial will be deemed so prejudicial that they support granting a habeas petition. *Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990). As the Appellate Division ruled, in both trials, "[t]he prosecutor adequately described in his opening statement what the People intended to prove, and properly prepared the jury to resolve the factual issues at the trial." *Bonds*, 128 A.D.3d at 1084; *see also Bonds*, 118 A.D.3d at 717. The state court's decision to reject the petitioner's arguments about the prosecutor's opening statements was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Therefore, this claim is denied.

## III.    *Brady* Violations

The petitioner argues that the prosecutor committed two *Brady* violations: that he did not turn over 911 recordings and did not disclose that he had agreed to be a reference for Ms. Rahman, who testified during the first trial. The Appellate Division's decisions rejecting these claims are entitled to AEDPA deference, and the petitioner must show that the decisions were either "contrary to, or involved an unreasonable application of, clearly established Federal law" or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

*Brady* requires the prosecution to disclose "evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley*, 473 U.S. 667 (1985) (quoting *Brady*, 373 U.S. at 87). To establish a *Brady* violation, a petitioner "must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (internal quotation marks

omitted) (quoting *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001)). Reversal is required "if there is a 'reasonable probability' that disclosure would have changed the outcome of the case, or where the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995)). The Appellate Division found that the prosecutor made the necessary disclosures—that he turned over the 911 recordings before trial and disclosed his contact with the witness before she testified. Those decisions are entitled to deference on habeas review. *See, e.g., Thompson v. Fischer*, No. 02-CV-0526, 2003 WL 23198787, at *20 (E.D.N.Y. Oct. 31, 2003) (finding of fact in connection with disclosure claim is entitled to deference).

The state court's rejection of the petitioner's *Brady* claims was neither contrary to nor an unreasonable application of existing Supreme Court precedent. The prosecutor disclosed before Ms. Rahman's direct examination that he had agreed to be a reference for her, and defense counsel did not object.[17] The Appellate Division rejected the petitioner's appellate claim on this issue, holding that while it was "improper under the circumstances of this case" for the prosecutor to agree to act as a reference, the witness's request and its subsequent disclosure "did not deprive the defendant of a fair trial." *People v. Bonds*, 118 A.D.3d 717, 719 (2d Dep't 2014). Counsel knew about the reference issue before he cross-examined Ms. Rahman, and chose not to ask her any questions about it. As for the petitioner's claims about the 911 recordings, the Appellate Division similarly held that "[t]he material at issue was turned over to the defendant before opening statements were made and in sufficient time for him to use it in a meaningful fashion during cross-examination or as evidence during his case. . . . In any event, there was no indication that a reasonable possibility existed that earlier disclosure of the material

---

[17] Ms. Rahman did not testify at the petitioner's second trial.

might have led to a different outcome of the trial." *Id*. at 720. Because the prosecutor turned over the materials about which the petitioner complains, there was no *Brady* violation. The petitioner's request for habeas relief on this basis is therefore denied.

## IV.  State Court's Evidentiary Rulings

The petitioner argues that the trial court's evidentiary rulings deprived him of a fair trial. Specifically, he argues that the trial court should not have admitted Ms. Wilks' statements to Ms. Rahman about the robbery or the 911 recording that included her description of the attacker. The petitioner also argues that the trial court should not have admitted a redacted version of his videotaped statement during his second trial.

The Appellate Division found that the claims about Ms. Wilks' statements were unpreserved because the petitioner objected only on hearsay grounds and not on the basis of the Confrontation Clause. *People v. Bonds*, 118 A.D.3d 717, 719 (2014). Therefore, any argument under the Confrontation Clause is procedurally barred. *See* N.Y. Crim. Proc. Law § 470.05(2); *see, e.g., Davidson v. Cunningham*, No. 16-CV-01125, 2017 WL 3738560, at *8 (E.D.N.Y. Aug. 29, 2017) ("New York preservation doctrine provides an independent and adequate ground for decision for the purposes of habeas review."); *Santiago v. Miller*, No. 01-CV-3256, 2003 WL 22284173, at *13 (E.D.N.Y. Aug. 20, 2003) ("New York State's contemporaneous objection rule is an adequate and independent state ground for decision."). The petitioner has not shown cause for the default or actual prejudice, nor has he demonstrated that failure to consider these claims will result in a fundamental miscarriage of justice.

Even if the petitioner's claims were not procedurally barred, they fail on the merits. The petitioner relies primarily on *Crawford v. Washington*, 541 U.S. 36 (2004), in which the Supreme Court held that testimonial hearsay statements are inadmissible unless the declarant is

unavailable and the petitioner had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36 (2004). This ruling does not apply to non-testimonial statements, which the Supreme Court has defined as follows: "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). After *Davis*, "[s]everal courts . . . have found, consistent with that decision, that statements of 911 callers, made during an ongoing emergency and for the purpose of obtaining police assistance, are nontestimonial, and thus admission of such statements does not violate a defendant's rights under the Confrontation Clause." *United States v. Chen Kuo*, No. 10-CR-671, 2011 WL 145471, at *7 (E.D.N.Y. Jan. 18, 2011) (collecting cases). As the Appellate Division found, Ms. Wilks' statements to Ms. Rahman and on the 911 tape, which merely described the attack without identifying the petitioner, were "properly admitted under the excited utterance exception to the hearsay rule" and "did not constitute a confrontation clause violation." *Bonds*, 118 A.D.3d at 718-19.

The petitioner also challenges the trial court's admission of his videotaped confession—which was redacted for the petitioner's benefit to remove references to the Wilks' robbery—on common law evidentiary grounds. A state court's evidentiary rulings typically do not present constitutional issues cognizable by a federal court. *See generally* 28 U.S.C. § 2254; *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law"). Courts "acknowledge our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). A federal habeas petitioner cannot prevail on a claim that a state court's evidentiary error deprived him of due process unless he shows "that the error was so pervasive as to have denied

him a fundamentally fair trial," which he does not demonstrate here. *Singletary v. Fischer*, 227 F.R.D. 209, 223 (E.D.N.Y. 2003) (citing *United States v. Agurs*, 427 U.S. 97, 108 (1976)). The redactions to the petitioner's videotaped statement were made to eliminate references to the Wilks robbery when the videotape was admitted at his second trial. The petitioner does not demonstrate that these redactions, which were for his benefit, prejudiced him in any way, or that the redacted video was corrupted.

In any event, there was powerful evidence of the petitioner's guilt of both attacks. He confessed to robbing Ms. Wilks and identified her photograph, on which he wrote, "This is the girl from the robbery incident." (Bonds I: ECF No. 8 at 583:16-18.) Ms. Serraty identified him as her attacker, his DNA was recovered from vaginal swabs, and he admitted that he threatened her at gunpoint. The jury understandably rejected his story that Ms. Serraty volunteered to have consensual sex with him moments after he threatened her with a gun, and then offered her debit card to him. In light of the overwhelming evidence of the petitioner's guilt, there is no basis for disturbing the state court's rulings.

## V.      Ineffective Assistance of Trial Counsel

As he did on direct appeal and in the *coram nobis* proceedings, the petitioner raises generic complaints about his attorney's strategic decisions during both trials. He says that his attorney "made incriminating statements against" him by pursuing the defense—based on the petitioner's statements to detectives—that the petitioner and Ms. Serraty had consensual sex. He also says that his attorney should have moved to sever the charges and should have moved to dismiss on the theory that the petitioner used a "fake gun." (Bonds I: ECF No. 1; Bonds II: ECF No. 1.) The Appellate Division rejected his argument about his lawyer as "without merit" during his first appeal. *Bonds*, 118 A.D.3d at 720. After his second trial, the court, citing *Strickland v.*

*Washington,* 466 U.S. 668, 687 (1984), held that the petitioner "has not demonstrated that his trial counsel was ineffective under either federal or state constitutional standards." *People v. Bonds*, 128 A.D.3d 1083, 1084 (2d Dep't 2015).

Generally, to establish ineffective assistance of counsel, a petitioner must demonstrate that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that he suffered prejudice. *Strickland,* 466 U.S. at 687. The petitioner cannot meet the first part of the *Strickland* test merely by showing that his counsel employed a losing strategy or made a mistake; instead, the petitioner must establish that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *LanFranco v. Murray,* 313 F.3d 112, 118 (2d Cir. 2002) (citing *Strickland,* 466 U.S. at 687). The petitioner can establish the prejudice prong of the *Strickland* test only if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Charles v. Fischer*, 516 F. Supp. 2d 210, 216 (E.D.N.Y. 2007). In applying the two-part test, "judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The relevant inquiry focuses "on the fundamental fairness of the proceeding whose result is being challenged." *Id*.

The petitioner must overcome a separate hurdle on his complaints about counsel's performance at the second trial, because the state court specifically determined counsel was not ineffective under *Strickland*. The petitioner must therefore demonstrate that the Appellate Division's decision on the second trial was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011). The state court's decision is entitled to "deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at 101.

The petitioner's challenges to his trial counsel's performance at both trials do not meet either standard. The petitioner is faulting his lawyer for refraining from frivolous challenges to the charges and the evidence. For example, it would have been pointless for counsel to seek dismissal based on the petitioner's alleged use of a fake gun, because the petitioner was not charged with any crimes that had as an element the use of an operable gun. Nor was counsel obligated to move to sever the charges, a motion that in all likelihood would have failed. [18] As the Supreme Court explained, "[s]urmounting *Strickland*'s high bar is never an easy task" and "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington*, 562 U.S. at 104. The "central concern is not with grading counsel's performance but with discerning whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 696-97) (quotations omitted). "[I]t is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument[;] [c]ounsel is not obliged to advance every nonfrivolous argument that could be made." *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001). Trial counsel's decisions were "within the range of acceptable strategic and tactical alternatives and did not cause the

---

[18] Under New York law, counts in an indictment are joinable when the offenses are defined by the same or similar statutory provisions. N.Y. Crim. Proc. Law § 200.20(2)(c); *People v. Allah*, 238 A.D.2d 436 (2d Dep't 2001); *People v. Richardson*, 235 A.D.2d 502 (2d Dep't 1997). Whether to sever counts is committed to the trial court's discretion, and a petitioner must establish that severance would be "in the interest of justice and for good cause shown." N.Y. Crim. Proc. Law § 200.20(3); *People v. Mahboubian*, 74 N.Y.2d 174, 183 (1989).

representation to fall below the constitutionally acceptable level mandated by *Strickland*."
*United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). Nor was counsel's strategy on the
Serraty attack—that the petitioner and Ms. Serraty had consensual sex—constitutionally
ineffective. On the contrary, counsel had almost no other option, since the petitioner told police
that the encounter was mostly consensual and the DNA evidence linked him to the crime.
Accordingly, the petitioner's request for habeas relief on this basis is denied.

## VI.    Ineffective Assistance of Appellate Counsel

The petitioner also says that his appellate lawyer was ineffective. Specifically, he
challenges appellate counsel's failure to raise certain issues on appeal, including the claims about
his trial counsel's performance. He also claims that counsel should have argued there was "jury
misconduct." (Bonds I: ECF No. 1.)

The petitioner raised these claims in his applications for writs of error coram nobis,
which the Appellate Division denied, holding that the petitioner "failed to establish that he was
denied the effective assistance of appellate counsel." *Bonds*, 140 A.D.3d at 898; *Bonds*, 161
A.D.3d at 765. Appellate counsel's decision not to raise these claims falls well within "the wide
range of professionally competent assistance" permitted under *Strickland*. *Greiner v. Wells,* 417
F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland,* 466 U.S. at 690). The petitioner "bears the
burden of establishing both deficient performance and prejudice," and his assertion that his
appellate counsel should have raised these claims falls short of both requirements. *Fore v.
Ercole*, 594 F. Supp. 2d 281, 302 (E.D.N.Y. 2009). The "process of 'winnowing out weaker
arguments on appeal and focusing on' those more likely to prevail, far from being evidence of
incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527,
536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)); *accord Sellan v.*

*Kuhlman,* 261 F.3d 303, 317 (2d Cir. 2001).  Therefore, I deny this claim.

## VII.    Mode of Proceedings Error

The petitioner accuses the trial judge of "abus[ing] [his] discretion and committ[ing] a

mode of proceeding error" after taking the partial verdict in the first trial.  (Bonds I: ECF No. 1

at 8.)  The petitioner argues that the judge should have "made an inquiry" of the jury because one

juror did not agree with the other eleven on the sexual assault counts.  (*Id.*)

The petitioner did not raise this argument on direct appeal or on collateral review.

Generally, a district court should dismiss habeas petitions that contain claims which were not

exhausted in the state courts.  *See* 28 U.S.C. § 2254(b); *Rose v. Lundy*, 455 U.S. 509, 510 (1982).

However, it is not necessary to determine whether the petitioner exhausted this claim, nor is it

necessary to evaluate it on the merits, because it is based solely on state law, and therefore not

cognizable on habeas review.  28 U.S.C. § 2254(a).  Section 310.30 of New York's Criminal

Procedure Law requires the trial court to give a "meaningful response" to any note from the jury;

failure to do so is an "error affecting the mode of proceedings[.]"  *People v. Alcide*, 21 N.Y.3d

687, 692 (2013) (citations omitted).  However, "[a] [mode of proceedings] claim . . . does not

allege a violation of a federally protected right."  *Encarnacion-Cross v. McAuliffe*, No. 17-CV-

3603, 2018 WL 1913835, at *7 (S.D.N.Y. Apr. 23, 2018), *report and recommendation*

*adopted*, No. 17-CV-3603, 2018 WL 3384438 (S.D.N.Y. July 11, 2018) (holding that claims of a

mode of proceedings error "offers no basis for habeas corpus relief").  Therefore, this claim

presents a state law question that is not reviewable by a federal district court.

## CONCLUSION

Accordingly, both petitions for a writ of habeas corpus are denied in their entirety. The consolidated case is dismissed. A certificate of appealability will not be issued. *See* 28 U.S.C. § 2253(c). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith.


**SO ORDERED.**

s/Ann M. Donnelly

_____

Ann M. Donnelly
United States District Judge


Dated: Brooklyn, New York
      March 31, 2020